**Ronnie JENKINS, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 99–CF–1213, 02–CO–1366 and 04–CO–357.

District of Columbia Court of Appeals.

Argued Dec. 2, 2004.

Decided March 3, 2005.

---

Steven H. Goldblatt, Washington, DC, with whom Stephen C. Borgo, Student Counsel (No. 10213), was on the brief, for appellant.

Denise A. Simmonds, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Jeannie S. Rhee, Assistant United States Attorneys, were on the brief, for appellee.

Aaron Mendelsohn, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Kelly A. Higashi, Assistant United States Attorneys, were on the supplemental brief, for appellee.

Before SCHWELB and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

A jury found appellant, Ronnie Jenkins, guilty on one count of first-degree child sexual abuse, D.C.Code § 22–4108 (1981), and one count of first-degree cruelty to children, D.C.Code § 22–901(a) (1981). The trial court sentenced him to consecutive prison terms of five to fifteen years for the sexual abuse and three to nine years on the cruelty charge. We remand the case for further proceedings.

## I.

Jenkins was involved in a romantic relationship with K.J., the mother of a twelve-year-old boy, A.J., and a seven-year-old girl, I.J. On the evening of September 28, 1998, A.J. saw appellant sexually molesting I.J. in their mother's bedroom by "touching her privacy" with her "underwear below her knees." A.J. told his mother what he had seen, whereupon she slapped him. The children's mother then confronted I.J., who denied that anything had happened. Aware, however, that A.J. had accused him of molesting I.J. and that the police were on their way, Jenkins told the children's mother that he "was gonna fuck [A.J.] up." According to A.J., Jenkins then took him to A.J.'s room and beat him repeatedly. The next morning, A.J. confided in Ms. Tarkiashi Thompson, who lived with the family. She observed that A.J.'s "face was messed up.... [I]t looked like his nose was broken[;] there was red and purple marks on it and he had a fat lip. It looked like his face was lop-sided." A.J. asked Ms. Thompson to call his grandmother, which she did. Apparently the grandmother immediately called the police, who came straightaway to the apartment. Officer Leonora Armstead spoke with I.J. alone, then with A.J., after which the children were taken to the hospital for examination.

After Jenkins was charged, tried, and convicted for sexual abuse and cruelty, he filed a timely notice of appeal. He also filed a motion for a new trial under D.C.Code § 23–110 (2001) alleging ineffective assistance of counsel, which the trial court denied after a hearing—a ruling that Jenkins also has appealed. Finally, Jenkins appealed the trial court's grant of a government motion to correct the trial transcript of the poll of the jury verdict. We have consolidated these appeals.

## II.

In his § 23–110 motion for a new trial, Jenkins argued that his trial counsel, after requesting a poll of the jury, had been constitutionally ineffective in failing to point out that not all of the jurors had been polled and that the verdict, accordingly, was not unanimous as required for conviction. Logically preceding this collateral attack, however, is Jenkins' direct appeal of the trial court's post-trial ruling that corrected the trial transcript to show that the jury poll had, in fact, been unanimous. We therefore consider this latter issue first.

The trial transcript reflects that only eleven out of twelve jurors were polled after the jury announced a guilty verdict. Specifically, there is no record that juror number three was polled. After the poll was concluded without comment or objection, the trial judge asked if there were "anything further," and both government and defense counsel replied "no." As part of his § 23–110 motion, appellant Jenkins—represented by new counsel—alleged that the verdict was invalid because only eleven jurors had been polled. The trial judge, who was "astonished" at this thought, expressed her belief—without specific recollection of the poll—that there had been a transcription error. She suggested that the government ask the Court Reporting and Recording Division (CRRD) to review the tape and the reporter's notes. At the same time, however, without waiting for a response from CRRD, the judge rejected Jenkins' argument, as well as the others he had raised in support of his ineffectiveness claim (discussed below), and denied his new trial motion.

On January 7, 2004, in preparing for the consolidated appeal, the government requested the CRRD review. A month later, the Deputy Director of CRRD informed the government by unsworn letter that the trial transcript contained an error. The Deputy Director had reviewed the court reporter's notes and concluded that the transcript failed to reflect what actually had happened: juror number three had been polled and assented to the verdict. Corrected copies of the transcript were sent to both parties.

The government asked Jenkins to stipulate to this correction of the trial record, but he refused. The government then filed a motion in the trial court to correct the trial record pursuant to D.C.App. R. 10(e) (2004), which Jenkins opposed. The trial court granted the government's motion, noting that CRRD's review of the reporter's notes showed that juror number three had been polled and assented to the verdict. Appellant filed a timely appeal.

■ When a defendant requests a poll of the jury after an announced guilty verdict, the verdict will not be final until the poll has been completed and the jury's vote has been found unanimous. *Boykins v. United States*, 702 A.2d 1242, 1248 (D.C. 1997) (once jury poll has been requested, verdict is not immutable until poll is completed); *Thomas v. United States*, 544 A.2d 1260, 1262 (D.C.1988) ("a verdict is not final until the jury's deliberations are over, the result is announced in open court, and no dissent by a juror is registered") (quoting *Lewis v. United States*, 466 A.2d 1234, 1238 (D.C.1983)); *see* Super. Ct. Crim. R. 31(d) (1999).

■ This court will reverse a trial court's grant of a motion to correct the trial record only if the court's factual finding that the record required correction was clearly erroneous. *Cole v. United States*, 478 A.2d 277, 284–85 (D.C.1984); *see* D.C.Code § 17–305(a) (1981). The trial court's factual finding here—that the trial transcript should be corrected to show that juror number three (in addition

to the other eleven jurors) had assented to the verdict—was based exclusively on the CRRD Deputy Director's letter. That unsworn letter, however, was not competent enough evidence to show with sufficient certainty that juror number three had joined the others in a guilty verdict. In addition to being unverified—in contrast with the transcript itself "certified" by the court reporter—that letter was inadmissible hearsay. *See, e.g., Jones v. United States,* 829 A.2d 464, 466 (D.C.2003); *Gibson v. United States,* 792 A.2d 1059, 1067 (D.C.2002); *Stack v. United States,* 519 A.2d 147, 157 (D.C.1986). Nor did the letter indicate that the Deputy Director assuredly had the ability to review the reporter's notes for accuracy or, in any event, had reviewed the tape recording of the proceeding, as the trial court itself had suggested, to assure that juror number three had been polled.

■ These infirmities in the proof are not enough to demonstrate that the trial court's finding was clearly erroneous, to the point that the convictions must be reversed; but they are enough to require greater certainty before one can say with sufficient confidence that juror number three joined the verdict. Accordingly, we remand the case for further findings on this issue. *See Smith v. United States,* 665 A.2d 962 (D.C.1995); D.C.Code § 17–306 (2001). If the trial court, upon further inquiry, finds that juror number three did not assent to the verdict and that the verdict, therefore, was not unanimous, the court shall order a new trial. If, however, the trial court finds that this juror did join the verdict, Jenkins' convictions shall stand (in light of our rejection of his other contentions on appeal discussed below)—subject, of course, to his right to appeal the trial court's ruling, after remand, on the unanimity issue if he so chooses. (In view of this ruling on direct appeal, we need not consider Jenkins' argument, on collateral attack, that trial counsel had been constitutionally ineffective in failing to call the jury-poll issue to the court's attention; the trial court is now fully seized of the issue.)

## III.

At trial, defense counsel impeached A.J. with prior statements that he had made to a social worker about the details of I.J.'s molestation and of A.J.'s own subsequent actions. Defense counsel also impeached the children's mother with prior statements regarding Jenkins' role in disciplining her children. Defense counsel introduced these statements in evidence by reading them into the record from the transcripts of the interviews.

During deliberations, the jury sent a note to the court asking:

(1) What if we know of the prior statement *only* through a lawyer's questions?

(2) Can we see/read the various written statements referred to in testimony and in lawyers' questions? e.g. Ms. Johnson's written statement?

The trial court consulted with counsel and responded to the first question with the CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 1.07 (4th ed. 1996): "Sometimes a lawyer's question suggests that something is a fact. Whether or not something is a fact depends on the witness's answer, not the lawyer's question. A lawyer's question is not evidence." Defense counsel objected, arguing that this reinstruction suggested that there may not have been a prior statement. The objection was overruled.

■ When there has been objection, we review a trial court's decision on reinstructing the jury for abuse of discretion. *Talley v. Varma,* 689 A.2d 547, 550 n. 1 (D.C.1997). Jenkins argues that the first instruction was confusing and failed to ac-

commodate the jury's need to understand how to use the prior inconsistent statements. He adds, more specifically, that the response failed to make clear that a witness has admitted the facts in a lawyer's question when the witness answers "yes" to that question. Jenkins' contentions are not supported by the record. By reciting Standard Instruction 1.07, the trial court stated clearly that facts are established by a witness's answer, and not by a lawyer's question. This was a direct, balanced, and neutral response to the jury's first question, as the law requires. *See Coreas v. United States*, 565 A.2d 594, 599 (D.C.1989). There was no abuse of discretion.

▉ Responding to the second question—the jury's request, in effect, to see "various written statements" referred to by witnesses and the lawyers but not admitted in evidence—the trial court instructed the jury: "You have heard all of the evidence in the case and have been provided with all the exhibits that have been admitted into evidence." Defense counsel had not moved for admission of the written statements in evidence and did not object to this instruction. Accordingly, we review for plain error, not abuse of discretion. *Thomas v. United States*, 748 A.2d 931, 934 (D.C.2000).[1]

▉ Jenkins contends that the trial court's denial of the jury's request to view the written statements failed to accommodate the jurors' need to see and reconstruct the impeachment evidence, leaving them to recall the testimony imperfectly from memory and whatever notes were taken during trial. He acknowledges, however, that because the statements were not in evidence, the case would have had to be reopened for the jury to receive them,

see *Barron v. United States*, 818 A.2d 987, 992 (D.C.2003), and that defense counsel had not requested that the court place the statements before the jury or even that the court reporter read the testimony containing the statements to the jury. Under these circumstances, the trial court did not plainly err in declining to reopen the trial *sua sponte* to introduce the written statements in evidence. To the contrary, this court has noted that, when both parties agree at trial—as effectively occurred here in the absence of objection—that a written statement should not be furnished to the jury because it had not been admitted in evidence, the trial court's decision to withhold that statement from the jury does not constitute plain error, even when the jury has asked to see it. *Keys v. United States*, 767 A.2d 255, 259 n. 4 (D.C.2000) (no abuse of discretion, let alone plain error, when trial court, with concurrence of both parties, withheld from jury that asked to see it a police report not admitted in evidence but used to refresh recollection of police witness). Although the impeachments of A.J. and K.J. were central to Jenkins' defense, we cannot find plain error in the absence of any defense effort to have the trial court honor the jurors' request.

## IV.

Jenkins contends that he received constitutionally ineffective assistance of counsel in three respects (in addition to counsel's failure to object to the jury poll) and therefore is entitled under § 23–110 to a new trial. Specifically, Jenkins contends that trial counsel was constitutionally deficient in failing to thwart admission of three categories of hearsay in evidence.

▉ In reviewing trial court rulings on alleged ineffectiveness of counsel, we

---

1. We reject Jenkins' argument that, by objecting to one of the trial court's responses, he preserved both for appeal. *See Hunter v. United States*, 606 A.2d 139, 144 (D.C.1992).

accept trial court findings of fact unless they lack evidentiary support, and we review questions of law *de novo. James v. United States,* 718 A.2d 1083, 1089 (D.C. 1998). To establish ineffective assistance of counsel, an appellant must demonstrate first that his trial counsel's performance was deficient, indeed "so serious that counsel was not functioning as the 'counsel' guaranteed the [appellant] by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The appellant also must demonstrate that the deficient performance resulted in prejudice that deprived appellant of a fair trial. *Id.* Mere errors of judgment and tactical mistakes do not constitute deficiency, nor do mere disagreements with trial counsel's choices. *Id.* at 689–91, 104 S.Ct. 2052. On the other hand, decisions by counsel attributable to inaction or lack of preparation are not subject to deference. *Woodard v. United States,* 719 A.2d 966, 975 (D.C. 1998).

### A. Ms. Thompson's and Officer Armstead's Testimony

Relying on *Battle v. United States,* 630 A.2d 211 (D.C.1993), Jenkins argues that, under the "report of rape" exception to the rule barring hearsay evidence, testimony by someone who repeats verbatim a child's complaint of sexual abuse is inadmissible unless the child herself also testifies and the verbatim hearsay is admitted to corroborate the child's testimony. According to Jenkins, if the child does not testify, any hearsay testimony by another witness who heard the child complain of sexual abuse must be limited to a bare statement of "the fact that a complaint was made" (quoting 2 McCORMICK ON EVIDENCE § 272.1, at 223 (William Strong, 4th ed. 1992)). Therefore, Jenkins argues, defense counsel pro-

vided constitutionally ineffective assistance by acceding to the trial court's view that I.J. was not required to testify as a condition for admitting a verbatim hearsay report of her complaint.

That, however, is not what happened. Ms. Thompson testified that "[I.J.] said Ronnie [Jenkins] had her in her mother's bedroom and he was sticking his fingers in her vagina. He had a pillow over her hips." Trial counsel, citing *Battle,* objected on the ground that I.J. had not testified, but the objection was overruled. Later, Officer Armstead testified, without objection, that I.J. told her that Jenkins had "put his hand in her private parts." In each instance, the trial court gave a limiting instruction, informing the jury that the statement had been admitted not for its truth but for the limited purpose of demonstrating that I.J. had promptly reported the sexual assault.

In his opening brief, Jenkins faults trial counsel, who initially objected to Ms. Thompson's testimony, for "inexplicably" conceding, before the judge ruled, that *Battle* did not require the complainant to testify as a precondition of admitting Ms. Thompson's detailed, report-of-rape hearsay testimony in evidence. In his reply brief, however, Jenkins acknowledges his "mistake" in arguing that trial counsel had made this concession. After reviewing the government's brief and the trial transcript, Jenkins realized that counsel had maintained his objection while merely conceding, in answer to a question by the trial judge, that *Battle* did not provide a clear holding on the issue. Therefore, even if the trial judge erred in admitting Thompson's and Armstead's detailed testimony under the "report of rape" exception when I.J. did not testify—an issue we need not decide [2]—Jenkins has acknowledged that

---

**2.** Although Jenkins has cited admission of the

Armstead and Thompson testimony among

trial counsel maintained his objection to the hearsay. As a result, Jenkins' "ineffectiveness" argument as to Ms. Thompson's and Officer Armstead's testimony has evaporated.

## B.  Dr. Purow's Testimony

Dr. Benjamin Purow, who had examined I.J.'s brother, A.J., at the hospital, testified in part by reading the following statement of A.J. in a medical record, which also was admitted in evidence: "He says his mother's boyfriends [sic] struck him in the face and back … with a closed fist *because [A.J.] told his mother the boyfriend was sexually abusing [A.J.]'s sister.*" Trial counsel did not object, and the court issued no limiting instruction. Jenkins argues that the italicized testimony was highly prejudicial and thus that defense counsel was constitutionally ineffective in allowing its admission in evidence under the "medical diagnosis" exception to the hearsay rule because "it was irrelevant to A.J.'s diagnosis or treatment."

The government replies, quoting *Galindo v. United States,* 630 A.2d 202 (D.C. 1993), that when a child (here, A.J.) is "sexually assaulted by someone who is effectively a member of the child's immediate household" (here, Jenkins), that child's statement explaining the cause of the injury, even when identifying who is to blame, is admissible for its truth under the medical diagnosis exception "when reasonably pertinent to treatment," including treatment of "psychological and emotional consequences." *Id.* at 210.[3] Because Jenkins' beatings of A.J. were directly related to A.J.'s observations of Jenkins' sexual

abuse of A.J.'s sister, I.J., the injuries to A.J. requiring treatment by Dr. Purow were psychological as well as physical. Thus, according to the government, A.J.'s observations about I.J.'s assault were relevant to A.J.'s treatment and, contrary to Jenkins' contention, came within the medical diagnosis exception.

Furthermore, says the government, any prejudice from admitting Dr. Purow's medical record was mitigated by the fact that not only Dr. Purow but also A.J., the children's mother, and Ms. Thompson testified, all of whom were subject to cross-examination. In particular, A.J. testified that Jenkins had accused him of lying and had beaten him repeatedly after A.J. told his mother about what Jenkins had done to I.J. A.J.'s mother testified, moreover, that Jenkins had said he was going to "fuck [A.J.] up," that she had heard A.J. yell and had asked Jenkins to stop hitting him, and that she had found A.J. curled up on his bed crying. Finally, Ms. Thompson testified that she had seen A.J. with a "messed up" and "lop-sided" face, an apparently "broken" nose covered with "red and purple marks," and a "fat lip," and that Jenkins had admitted to her "whopping" A.J. According to the government, therefore, A.J.'s statement to Dr. Purow was "cumulative of the trial testimony," which mitigated any prejudice arising from the medical record. *Galindo,* 630 A.2d at 211.

▮▮▮ We agree with the government not only that the hearsay report of A.J.'s statement at issue was relevant to A.J.'s diagnosis and treatment, but also that Dr. Purow's medical record containing that statement was accompanied by the kind of

---

the instances reflecting alleged ineffective assistance of counsel, he has not claimed on direct appeal that admission of that testimony amounted in itself to reversible trial court error.

**3.**  For purposes of analysis, the fact that A.J. (unlike I.J.) was not necessarily assaulted "sexually" is irrelevant. *Galindo* does not differentiate between sexual and non-sexual child abuse in explaining the medical diagnosis exception to the hearsay rule.

testimony and cross-examination that tested the statement's reliability. There was a confluence of evidence that precluded error in the absence of discernible prejudice. From this perspective, the error-harmless error issues merge. In sum, we perceive no reversible error in the admission of the challenged statement in Dr. Purow's medical record, let alone any deficiency in trial counsel's decision not to object to its admission.

## C. Dr. Quinn's Testimony

At trial, the prosecutor asked Dr. Michael Quinn, one of I.J.'s two treating physicians, to read in evidence a medical record prepared by the other physician, Dr. Fallack. That record reported a statement by I.J.'s grandmother that I.J. had told her that Jenkins had "put [a] pillow over my body and put his fingers in my privates."

Trial counsel objected on grounds of inadmissible hearsay. The prosecutor countered that the entire medical record (like that of Dr. Purow) was admissible for its truth under the "medical diagnosis" exception to the hearsay rule, citing Federal Rules of Evidence 803(4)[4] and a similar

(though distinguishable)[5] factual pattern in *Galindo v. United States, supra.* Trial counsel replied that *Galindo* was inapposite because it was not a medical record case. *Galindo,* he pointed out, was entirely testimonial; not only the doctor but also the mother and child whose hearsay statements were at issue all testified at trial, subject to cross-examination. *Galindo,* 630 A.2d at 211. That distinction, he said, left no room for admission of I.J.'s recorded, uncross-examined, hearsay statement to her grandmother contained in the medical record.

The prosecutor rejoined that a first-level hearsay statement "made in aid of medical diagnosis" (here, by the grandmother to Dr. Flack), incorporating a second-level hearsay statement by the patient (here, I.J.), will be admissible in its entirety if the first-level declarant is "someone with a special relationship to the person seeking treatment."[6] According to the prosecutor, nothing in *Galindo* suggested that the grandmother's testimony, incorporating I.J.'s story, could not be presented exclusively—without redaction—through a medical record in lieu of live testimony.

---

**4.** Fed.R.Evid. 803(4) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * *

(4) **Statements for purposes of medical diagnosis or treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

**5.** *Galindo* upheld admission of a doctor's hearsay testimony at trial that the mother of a child who had been sexually abused told the doctor that the child's caretaker had "put his genitalia and touched" the child and had

"urinated" on her. *Galindo,* 630 A.2d at 205. No medical record was in evidence. Furthermore, the doctor's testimony contained only the foregoing conclusory statement in which the mother spoke for the child; the doctor did not state explicitly what the child herself had said to her mother—in contrast with the present case in which the grandmother's statement in the medical record quoted verbatim what her granddaughter, I.J., had told her.

**6.** *See Barrera v. Wilson,* 668 A.2d 871, 873 (D.C.1995) ("medical diagnosis and treatment exception applies to statements in a hospital record reciting the injured party's explanation of the cause of the injury," provided that [1] the statement is "pertinent to a patient's diagnosis and treatment" and [2] the declarant is "the patient, or someone in a special relationship with the patient such as a parent").

Noting that the government was seeking admission "for the truth of the matter asserted" not only of the grandmother's statement to Dr. Fallack but also of I.J.'s statement to the grandmother, the trial court was troubled. The court recognized that hearsay is admissible for its truth under the medical diagnosis exception—typically, the first-level hearsay statement of a patient to her doctor recorded in a medical record—because of the presumed truthfulness of a patient who seeks a doctor's help for illness or injury. *Galindo,* 630 A.2d at 210; *Sullivan v. United States,* 404 A.2d 153, 158 (D.C.1979) (quoting MCCORMICK ON EVIDENCE § 292 (2d ed. E. Cleary 1972)). But the trial court wondered whether there was "comparable trustworthiness" of a child's statement to a parent or grandparent about the child's condition that would justify admission of such second-level hearsay under the "special relationship" rationale in every case:

> [U]nderneath all of that has to be some underlying assumption that the child in reporting to the parent would similarly be giving an accurate report to the parent, and I am wondering whether we don't need to have some testimony from the grandmother that is a foundation to understand the nature of that relationship, to see whether it's appropriate to apply, to permit the intermediary to serve as a surrogate for the child really, in talking to the doctor.[7]

The court accordingly said, "I want to think about this" and took a brief recess.

When court reconvened a half hour later, and before the trial judge ruled, trial counsel withdrew his objection, permitting admission of the medical record for the truth of the grandmother's and I.J.'s statements in it. Counsel explained at the § 23–110 hearing that he preferred the jury to hear these statements through the static, relatively antiseptic vehicle of a medical record, rather than through the live testimony of the grandmother, who otherwise, he believed, would surely be called as a government witness. Her hatred of appellant, he said, was palpable. In his judgment, she was likely to blurt out irrelevant, prejudicial statements that Jenkins had abused her daughter and grandchildren on previous occasions. Nor did counsel want the jury to hear I.J. testify, inevitably arousing sympathy. It appeared to counsel that the government would not call these witnesses if the medical record in full were allowed in evidence. (And, of course, if counsel predicted wrongly and the government called them to the stand anyway, subject to cross-examination, counsel had to know—as we have seen in connection with Dr. Purow's testimony—that there would have been little if any chance under *Galindo* of suppressing the medical record as additional evidence).

The question, then, is whether this trial strategy, as Jenkins now contends, was constitutionally deficient under *Strickland v. Washington, supra,* on the ground that counsel could—and should—have kept

---

7. The trial court's concerns reflected the thinking expressed in recent case law from other jurisdictions. For example, could not a child be lying about what happened in order to cover up, for any number of reasons, what actually occurred? *See Jose v. Johnson,* 1999 WL 1120374 (D.Or.) (second-level hearsay statement of child denying sexual activity lacked sufficient indicia of reliability under medical diagnosis exception). Or could not even the youngest of children be prone to distorted recollection for any number of reasons, including inadvertent suggestion or even coaching? *See Reed v. Thalacker,* 198 F.3d 1058, 1062 (8th Cir.1999) (questioning trustworthiness of child's statement under "excited utterance" exception to hearsay rule).

I.J.'s hearsay statement away from the jury.

Noting the "double-hearsay" nature of the medical record, Jenkins argues that even if the "medical diagnosis" exception would permit admission of the grandmother's statement to Dr. Fallack (on the ground that the grandmother had a "special relationship" with I.J.), that exception would not permit admission of the second level of hearsay: I.J.'s statement to her grandmother. That statement, he says, required an independent basis for admissibility that is altogether lacking here (citing *Barrera, supra* note 6, 668 A.2d at 873 n. 3 ("each of the out-of-court statements must satisfy the requirements of some exception to the hearsay rule")). For this reason, he says, this court's opinion in *Galindo*—which did not concern second-level hearsay, *see supra* note 5—cannot be read to permit admission of such hearsay. Furthermore, according to Jenkins, *Galindo* was not a medical record case and thus for that reason, too, does not allow admission of I.J.'s second-level hearsay through a medical record alone, without any opportunity for cross-examination of one or more of the critical declarants (in this case, the grandmother and I.J.).

■ We must agree with appellant to this extent: *Galindo* did not expressly deal with second-level hearsay. It also is true that, because the crucial witnesses in *Galindo* testified at trial, our "special relationship" analysis in that opinion did not come to grips with the evidentiary question presented here: whether a child's second-level hearsay description of her sexual assault contained in a medical record is admissible under the medical diagnosis exception to the hearsay rule. Although *Galindo*—in a stretch—might be read to permit, or at least not to bar, admission of a medical record containing such second-level hearsay, without related live testimony, a more

careful reading would conclude that this court left that question open. This open question, however, is not before us in the present case. The question, rather, is whether defense counsel was constitutionally deficient in failing to force the trial court to resolve this unsettled hearsay issue by persisting with an objection to admission of Dr. Quinn's medical record.

While it is not far-fetched to suggest that a trial counsel will lack resourcefulness in failing to challenge second-level hearsay in a medical record, it is difficult, in light of *Galindo,* to conclude that a lawyer who lacks that resourcefulness is constitutionally deficient. But even more to the point, trial counsel, in objecting initially to that hearsay, appears to have recognized the potential for that objection—a recognition that supports the trial court's conclusion that counsel made a strategic decision in withdrawing his objection, rather than a decision based on inadequate understanding of the law. We agree with the trial court that counsel finally decided, as a matter of trial strategy, to permit admission of the first- and second-level written hearsay in the medical record, even for the truth of the statements made, in lieu of risking live testimony by a hostile witness, the grandmother, and the sympathetic complainant, I.J. Some may question this strategy, but the Constitution, as interpreted by *Strickland,* does not permit us to substitute our judgment for that of trial counsel on these facts, especially when Jenkins faults trial counsel not for failing to pursue a sure thing—a patently correct objection—but for failing to force the trial court to rule on an issue of first impression in this jurisdiction. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. We conclude, accordingly, that trial counsel's performance was not constitutionally deficient. (We therefore need not

reach the second, "prejudice" question under *Strickland*).

\* \* \* \* \* \*

We affirm in all respects except on the jury unanimity issue set forth in Part II. above, on which we remand the case for further proceedings consistent with this opinion.

*So ordered.*